IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Dennis Ryan,<br><br>        Plaintiff,<br><br>   vs.<br><br>Commissioner of Social Security<br>Administration,<br><br>      Defendant. | CASE NO. 1:23-cv-0130<br><br>**DISTRICT JUDGE**<br>Benita Y. Pearson<br><br>**MAGISTRATE JUDGE**<br>James E. Grimes Jr.<br><br>**REPORT &**<br>**RECOMMENDATION** |

Plaintiff Dennis Ryan filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In November 2020, Ryan filed an application for disability insurance benefits alleging a disability onset date of November 26, 2015.[1] Tr. 66, 73. He claimed that he was disabled due to multiple wrist ligament tears following an

---

[1] "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

injury, degenerative arthritis in his wrist, pain and loss of use in his dominant wrist, depression, anxiety, "stress issues," and diabetes. Tr. 66. The Commissioner denied Ryan's application at the initial level and upon reconsideration. Tr. 66–72, 74–80. In February 2022, an ALJ held a hearing at which Ryan and a vocational expert testified. Tr. 30–64. In early March 2022, the ALJ issued a written decision finding that Ryan was not disabled. Tr. 13–29. The ALJ's decision became final in December 2022, when the Appeals Council declined further review. Tr. 1–7; *see* 20 C.F.R. § 404.981. Ryan filed this action in January 2023. Doc. 1. He asserts that:

> [t]he ALJ committed reversible error in that the ALJ failed to adequately evaluate the limiting effects of Plaintiff's pain in accordance with SSR 16-3p.

Doc. 7, at 12.

## Factual background

### 1. *Personal and vocational evidence*

Ryan was born in February 1970. Tr. 66. He was 45 years old on November 26, 2015, the alleged disability onset date, and 50 years old on December 31, 2020, the date on which Ryan was last insured.[2] Tr. 66. Ryan

---

[2]     To be entitled to Disability Insurance Benefits, a claimant must be a wage-earner who accumulated sufficient earning credits and became disabled before the end of his or her insured date. *See, e.g.*, 42 U.S.C. § 423(c)(1); *see also Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Soc. Sec. Disab. Claims Prac. & Proc.* § 5:3 (2nd ed. 2022). Ryan alleged an onset date of November 26, 2015, so the issue in this case is whether he was disabled from November 26, 2015, through December 31, 2020, the date on which he was last insured. Tr. 66.

has two associate's degrees. Tr. 41. He previously worked as registered nurse. Tr. 41. Ryan has not worked since he sustained a work-related injury to his right wrist in mid-November 2015. Tr. 66, 403.

2. *Medical evidence*[3]

In November 2015, Ryan was working as a registered nurse at Cleveland Clinic Hilcrest Hospital when he attempted to restrain an aggressive patient and engaged in a struggle with that patient, twisting his right wrist in the process.[4] Tr. 402, 403, 410. Ryan went to the emergency department at Hilcrest Hospital and complained of wrist pain upon movement that worsened with rotation. Tr. 410. Treating physician Brian William Marshall, D.O., found that Ryan had tenderness in his right wrist, but observed that Ryan's range of motion was normal. Tr. 412, 431. X-ray images showed no fracture or other abnormality. Tr. 648. Dr. Marshall diagnosed Ryan with a wrist sprain. Tr. 412–13. He applied a Velcro splint and discharged Ryan with instructions to follow-up with an orthopedist. Tr. 413, 646, 648.

Ryan saw orthopedic specialist Anne M. Rex, D.O., in December 2015. Tr. 415. Ryan reported aching, intermittent pain with a severity level of "3" out of ten. Tr. 416. The pain travelled along the ulnar—little finger—side of Ryan's

---

[3]     This recitation of facts is not intended to be exhaustive and is limited to evidence submitted by the parties in their briefs.

[4]     Although Ryan asserts that this event took place on November 15, 2015, *see* Doc. 6, at 1, Doc. 7, at 3, the record shows that it instead took place on November 26, 2015, *see* Tr. 410–12, 644.

forearm to his elbow and made it difficult for him to open jars, carry bags, and use a knife. Tr. 416, 418. Ryan reported some initial discoloration and mild swelling. Tr. 416. Dr. Rex found no erythema,[5] ecchymosis,[6] or swelling in Ryan's right wrist or hand. Tr. 417. Ryan had tenderness when Dr. Rex directly palpitated the distal ulna and ulnar styloid process.[7] *Id*. Ryan had a "little bit of pain" in the ECU tendon subsheath.[8] *Id*. He could flex and extend his right wrist without difficulty. *Id*. Ryan experienced mild discomfort upon radial

---

[5]    Erythema is "redness of the skin produced by congestion of the capillaries." Dorland's Illustrated Medical Dictionary 505 (33rd ed. 2020).

[6]    Ecchymosis is a small blue or purplish hemorrhagic spot on the skin. Dorland's Illustrated Medical Dictionary 582 (33rd ed. 2020).

[7]    The ulnar styloid process is a bony projection at the distal end of the ulna which fits into the cartilage of the wrist joint. *Ulnar Styloid Fracture*, Healthline,          https://www.healthline.com/health/ulnar-styloid-fracture, [https://perma.cc/RAN8-TKFK]. It plays an important role in the strength and flexibility of the wrist and forearm. *Id*.

[8]    The ECU tendon connects the forearm to the wrist and runs from the elbow down to the distal tip of the ulna. *Extensor Carpi Ulnaris (ECU) Subsheath          Rupture*,          Upswing          Health, https://upswinghealth.com/conditions/extensor-carpi-ulnaris-ecu-subsheath-rupture/ [https://perma.cc/DW6E-KXV3]. The ECU tendon subsheath holds the ECU tendon in place at the base of the small finger. *Id*. A sudden twisting of the wrist can rupture the sheath, allowing the tendon to snap in and out of place. *Id*.

deviation[9] and ulnar grind.[10] *Id*. Dr. Rex diagnosed Ryan with a sprain, a contusion, and pain in his right wrist. Dr. Rex recommended that Ryan continue taking anti-inflammatory medication, icing his wrist, and using the splint. *Id*. She suggested that Ryan avoid overhead repetitive motions, heavy lifting, and pushing and pulling. *Id*. Dr. Rex ordered updated x-rays of Ryan's wrist and hand and instructed him to follow-up in three weeks. *Id*., Tr. 425.

Ryan saw Dr. Rex three weeks later and reported that at work, his pain had worsened and he was restricted to light duty work. Tr. 425. Ryan's mid-December x-rays showed "subtle subchondral sclerosis in the proximal articular surface of the lunate[11] with small cysts," Tr. 423, which "raise[d] the possibility of ulnar lunate abutment."[12] *Id*. Dr. Rex found that Ryan had

---

[9]     Radial deviation is the tilting of the hand toward the thumb and radius. *Anatomy of the Wrist*, Acro Physical Therapy & Fitness, https://www.acropt.com/blog/2017/5/28/anatomy-of-the-wrist-mfkkp [https://perma.cc/6N43-UDKC].

[10]     In an ulnar grinding test, a provider holds the patient's forearm in a fixed position and his or her wrist in dorsiflexion, or bent backwards. *Ulnar Grinding Test, Triangular Fibrocartilage Complex (TFCC)*, Physiotutors, https://www.physiotutors.com/wiki/ulnar-grinding-test/ [https://perma.cc/PGP9-7VXA]. The provider then applies pressure while rotating and deviating the patient's wrist. *Id*.

[11]     The hand has eight carpals, small bones that make up the wrist area between the bones of the forearm and the fingers. *Lunate*, Healthline, https://www.healthline.com/human-body-maps/lunate-bone#1 [https://perma.cc/4HRG-8QKU]. The lunate is one of these eight bones. *Id*.

[12]     Ulnar abutment, also known as ulnar impaction syndrome, is a painful degenerative wrist condition caused by the ulnar head contacting the carpal bones with injury to the triangular fibrocartilage complex. *Ulnar Impaction*

tenderness with palpation and pain over his triangular fibrocartilage complex (TFCC),[13] ECU tendon, the ulnar aspect of his wrist, and his ulnar styloid. *Id*. Dr. Rex noted that Ryan's pain had "only mildly improved" in the six weeks since his incident. Tr. 425. Dr. Rex recommended that Ryan have an MRI and continue to utilize the wrist brace. Tr. 425. She suggested that Ryan remain on light duty at work and avoid any heavy lifting, pulling, and pushing. *Id*.

Ryan underwent an MRI in mid-January 2016. Tr. 435–36. The results showed a tiny ganglion cyst on Ryan's ulnar styloid process, mild swelling above his ECU tendon with normal tendon position and substance, indirect evidence of a possible scapholunate ligament tear, and degenerative changes in his TFCC without a distinct tear. Tr. 435–36, 601.

A few days later, Ryan had a follow-up with Dr. Rex. Tr. 628. Dr. Rex observed ongoing tenderness upon palpitation over the ulnar aspect of Ryan's TFCC and his ECU tendon with "mild deep pain" surrounding the scapholunate ligament. *See* Tr. 628. Dr. Rex reviewed the MRI results and indicated that she was concerned about possible tears in Ryan's scapholunate

---

*Syndrome*, Radiopaedia.org, https://radiopaedia.org/articles/ulnar-impaction-syndrome?lang=us [https://perma.cc/28RY-2NGS].

[13]    The triangular fibrocartilage complex is a structure made up of ligaments and cartilage that helps stabilize, support, and cushion the wrist. *Triangular Fibrocartilage Complex Tear (TFCC)*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/21832-triangular-fibrocartilage-complex-tear-tfcc [https://perma.cc/F82X-WN5X]. The TFCC attaches the ulna and radius to each other and to the small bones of the wrist. *Id*. It is responsible for the wrist's ability to rotate and grip objects tightly. *Id*.

ligament or TFCC. Tr. 629. Dr. Rex suggested that Ryan consult a wrist surgeon to address instability. *Id*. Dr. Rex continued to recommend that Ryan be restricted to light duty at work, avoid weight-bearing activities, and utilize the splint. *Id*.

At the end of January, Dean Erickson, M.D., conducted an independent medical evaluation at the request of Associated Compensation Resources as part of a workers' compensation claim that Ryan was pursuing. Tr. 396. Dr. Erickson's mandate was to evaluate the extent of Ryan's right wrist injury and opine as to whether Ryan's injury had achieved maximum medical improvement. *Id*. Dr. Erickson reviewed Ryan's initial report of the injury, emergency room medical records, Dr. Rex's treatment notes, and the results of the MRI. Tr. 396. Dr. Erickson determined that Ryan's claims needed further evaluation by an upper extremity orthopedic specialist. Tr. 399.

To that end, in March 2016, Ryan saw upper extremity orthopedic specialist Steven Maschke, M.D. Tr. 343, 369, 620. Ryan described throbbing, dull, aching pain, which he rated at a severity level of "5" out of ten and which he described experiencing morning, day, and night. *Id*. Ryan indicated that as a result of his condition, he was unable to do heavy household chores or participate in recreational activities. *Id*. Dr. Maschke found that Ryan had mild ulnar-side tenderness upon palpitation. Tr. 622. Ryan's physical examination was otherwise unremarkable. *Id*. Dr. Maschke diagnosed Ryan as having a degenerative TFCC tear. Tr. 351, 622. During a follow-up

7

appointment a few weeks later, Ryan began receiving corticosteroid injections from Dr. Maschke. Tr. 351, 356, 513.

Ryan returned to Dr. Maschke in June 2016. Tr. 514–15. Ryan reported receiving modest and short-term pain relief from the steroid injection. Tr. 513, 514. Ryan reported essentially the same symptoms as before, with the addition of some ulnar forearm pain. *Id*. Ryan complained of pain with rotational movements such as turning a door knob. *Id*. Dr. Maschke found that Ryan had pain with ulnar deviation and tenderness upon palpation of the ulnocarpal joint. Tr. 515. Dr. Maschke gave Ryan a corticosteroid injection. *Id*.

In August 2016, Dr. Erickson provided an updated opinion in connection to Ryan's workers' compensation claim. Tr. 369–71. In it, Dr. Erickson detailed video surveillance that he had watched that showed Ryan working in his yard from 12:45 P.M. until 1:20 P.M. on May 12, 2016. Tr 370–71. Dr. Erickson wrote that he observed Ryan "repetitively grasp[] and lift[]" what appeared to be landscaping bricks and other materials while "demonstrating no loss of function in his right hand or wrist." Tr. 369–70. Dr. Erickson said that the video also showed Ryan using a rake with no apparent evidence of pain or functional impairment. Tr. 370.

Dr. Erickson's updated opinion found that Ryan's "allowed condition" of a right wrist sprain had stabilized and that he did not anticipate "further fundamental, functional, or physiologic improvement." Tr. 370. "Despite further treatment and/or rehabilitation," Dr. Erickson found that Ryan's right

wrist sprain had "reached maximum medical improvement." *Id*. Dr. Erickson noted that Ryan had been given the opportunity to finish "appropriate evaluation and treatment" with respect to his right wrist sprain. *Id*. That treatment had consisted of a corticosteroid injection to the right wrist for the "non-allowed condition" of degenerative TFCC tear. *Id*. Dr. Erickson also noted that Ryan had cancelled a follow-up appointment with Dr. Maschke— scheduled for the day that Ryan was observed on video working in his yard— and declined to attend occupational therapy. Tr. 370. As Ryan had not complied with the recommended follow-up, Dr. Erickson "reasonably assumed" that Ryan had no further symptoms regarding his right wrist. *Id*. Dr. Erickson relied on the video footage to find that "Ryan demonstrated no functional impairment or pain behavior with full and complete utilization of his right upper extremity including the right wrist." Tr. 370–71.

Ryan saw Dr. Maschke in October 2016. Tr. 515–17. Dr. Maschke noted that Ryan's symptoms had remained the same. Tr. 516. Dr. Maschke administered another steroid injection, which Ryan "tolerated well." Tr. 517. Dr. Maschke indicated that he would consider arthroscopy if the injections did not "achieve prolonged pain relief." *Id*.

In November 2016, Ryan established care with orthopedist Todd Hochman, M.D. Tr. 333–35. Ryan reported that the corticosteroid injections provided only short-term relief. Tr. 333. Ryan continued to experience pain throughout his right wrist. *Id*. Dr. Hochman found that Ryan had tenderness

in his distal radioulnar joint and the ulnar aspect of his wrist. Tr. 334. Ryan had crepitus and pain with ulnar deviation, dorsiflexion, supination, and pronation. *Id*. Dr. Hochman diagnosed Ryan with a right wrist sprain, though he wanted to review Ryan's additional records to confirm. *Id*. Dr. Hochman suggested that Ryan continue to use anti-inflammatories and ice to treat his wrist pain. *Id*.

In January 2017, Ryan had a follow-up with Dr. Maschke. Tr. 327–29. Ryan reported pain with pronation and heavy lifting. Tr. 327. Ryan said that he had experienced significant improvement after his previous steroid injection, however, his pain returned after six weeks. Tr. 327. Dr. Maschke determined that Ryan's injury had not responded to conservative treatment and suggested surgical intervention in the form of arthroscopy. Tr. 328.

Three months later, in March, Dr. Maschke performed a right wrist arthroscopy with debridement of the central TFCC perforation and debridement of carpal ligament tears. Tr. 328, 518–20. Ryan's postoperative appointments in April and May showed controlled pain and progress. Tr. 520–21.

In June 2017, Dr. Erickson provided an updated report as part of Ryan's workers' compensation claim. Tr. 317–20. Dr. Erickson reviewed the treatment records from Dr. Maschke, Dr. Hochman, and the "operative report" from Ryan's arthroscopy. Tr. 317. Dr. Erickson opined that the MRI results "highly suggested" a scapholunate ligament tear, however, the "mechanism of

injury"—being struck by an aggressive patient—was "more of a contusive force" and "would not be consistent with a scapholunate ligament tear." Tr. 319. Dr. Erickson noted that at the time of Ryan's surgery, his scapholunate ligament was frayed, which was "more consistent with degenerative tearing" than an acute trauma. Tr. 319–20.

At an April 2017 appointment with Dr. Maschke, Ryan said that he was pleased with his progress and described his pain as controlled. Tr. 520. Dr. Maschke found that the wound was healing well, that Ryan had no swelling, and that Ryan's sensation was intact. *Id.*

Ryan began occupational therapy for his right wrist in May 2017. Tr. 521. He reported stiffness, pain, impaired range of motion, and impaired function. Tr. 524. Ryan completed four sessions of occupational therapy in May. Tr. 522–29.

During Ryan's June and July 2017 follow-ups with Dr. Maschke, Ryan reported essentially the same symptoms: continued wrist pain, stiffness, some decreased function. Tr. 531, 552. In June, Dr. Maschke noted that the arthroscopy had revealed instability and disruption in Ryan's ligaments. Tr. 553. In July, Dr. Maschke's examination of Ryan's showed diminished range of motion with flexion and extension. Tr. 551. Ryan received a steroid injection from Dr. Maschke in July. Tr. 533, 552.

Ryan continued seeing Dr. Hochman for his wrist issues from September 2017 through March 2021. Dr. Hochman's records document Ryan's complaints

of wrist tenderness, crepitus, and reduced range of motion. Tr. 308, 311, 316, 453–58.

Ryan saw Dr. Hochman in April 2017.[14] Tr. 324. Dr. Hochman found that Ryan had chronic pain with a severity that ranged from mild to severe and was accompanied by intermittent sharp pain and paresthesia. Tr. 324. Ryan was in mild to moderate discomfort during the appointment and had tenderness over the ulnar aspect of the wrist, difficulty with resistance to supination, and pain with ulnar deviation. *Id*. At a June appointment, Ryan complained of atrophy and discoloration. Tr. 321–22. Dr. Hochman opined that it "was apparent" that Ryan's wrist injury was more significant than Dr. Hochman originally found and would require additional treatment. Tr. 322.

In September and December 2017, Ryan informed Dr. Hochman that he was unable to work, "not by choice" but "because there [was] no light duty work available." Tr. 458, 459. During both appointments, Ryan's distal radioulnar joint and ulnar aspect were tender and pain with ulnar deviation. *Id*. In September, Ryan also had pain with supination and pronation. Tr. 459.

Ryan saw Dr. Hochman in March and September 2018. Tr. 456–57. He reported persistent problems with his right wrist with respect to the activities

---

[14]    Although Dr. Hochman's report is from April 27, 2017, the narrative appears to be from a date prior to Ryan's March 2017 surgery. *See* Tr. 324. Dr. Hochman wrote that Ryan "[was] scheduled for the surgery on March 21, 2017," that he was "doing the best he [could] to get by," and, "At this time, the patient is going to pursue surgery through his supplemental insurance on March 21, 2017." It's thus likely that the observations of Ryan's condition in this report pre-date Ryan's operation. *Id*.

of daily living such as lifting a coffee cup, which he said would lead to residual pain the following day. Tr. 457. Dr. Hochman indicated that Ryan would continue using over-the-counter medications and his brace. Tr. 456.

Ryan saw Dr. Hochman in March and September 2019. Tr. 454, 455. In March, Dr. Hochman noted that Ryan "would have difficulty returning to work in the nursing field." Tr. 455. In September, Ryan reported that he had developed compensatory issues in his left wrist. Tr. 454. Dr. Hochman found that Ryan had crepitus, limited range of motion, and tenderness in his left wrist. *Id*. The limitations in Ryan's right wrist remained crepitus, limited range of motion, and tenderness. *Id*.

In March 2020, Dr. Hochman found that Ryan had increased pain in his left wrist with tenderness and limited range of motion Tr. 453. In September, Dr. Hochman noted that Ryan remained on long-term disability due to a lack of light work to which he could return. Tr. 308, 452.

In March 2021, Dr. Hochman noted that Ryan had developed more pain throughout his left wrist due to overuse and that he remained out of work due to the lack of light-duty work available to him. Tr. 451. Dr. Hochman found that Ryan had tenderness in both wrists that increased with range of motion. *Id*.

During the relevant time period, Ryan also saw his primary care provider, Todd Solomon, M.D., for regular wellness visits. Tr. 282, 285, 288,

291, 293. Ryan mentioned episodic pain in his right wrist that was triggered by overuse and lasted for several days at a time. Tr. 288, 293.

### 3. *State agency and other medical opinion evidence*[15]

In May 2021, state agency consultative physician Leon Hughes, M.D., reviewed the record. Tr. 70–72. He found that Ryan retained the residual functional capacity (RFC)[16] to lift 20 pounds occasionally and 10 pounds frequently, with frequent handling and reaching in all directions with the right hand or arm. Tr. 70–71. With respect to his right wrist, Dr. Hughes limited Ryan to frequently pushing, pulling, and using hand controls. Tr. 71. Dr. Hughes found Ryan's complaints of pain partially consistent with the objective medical evidence. Tr. 70. Specifically, Dr. Hughes opined that the evidence indicated "some issues with the wrist injury with some decreased range of motion but no other issues with range of motion, strength, or gait." *Id*. Dr.

---

[15]    When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[16]    An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

Hughes found that Ryan could perform light work with additional limitations. *Id*.

In August 2021, state agency consulting physician Abraham Mikalov, M.D., reviewed the medical evidence upon reconsideration and adopted Dr. Hughes's findings, including the opinion that Ryan had the RFC to perform work at a light exertional level with additional limitations. Tr. 78–80.

In October 2021, nearly a year after Ryan's date last insured, Dr. Hochman completed a medical source statement indicating that Ryan could occasionally lift up to 20 pounds, occasionally push or pull up to 25 pounds, and never engage in fine or gross manipulation with the right hand. Tr. 750–51. Dr. Hochman indicated that Ryan had tears in his right TFCC, scapholunate, and lunotriquetral ligaments which resulted in moderate pain and which would cause Ryan to be absent from work, take him off task during the day, and interfere with his ability to concentrate. Tr. 751.

### 4. *Testimonial evidence*

Ryan and a vocational expert testified during the hearing in February 2022. Tr. 30–64. Ryan was represented by attorney Rigel Ariza. Tr. 30. Ariza began the substantive portion of the hearing with an opening statement advocating that the ALJ find that Ryan was disabled. Tr. 36. Ryan then testified.

Ryan said that he was unable to work during the relevant time period because he had ongoing pain and wasn't able to use his non-dominant right

hand. *See* Tr. 42. Ryan couldn't type or write without his hands "locking up." Tr. 42, 43. He could lift about ten pounds individually with each of his hands and together, he estimated that he couldn't lift more than 20 pounds. *Id*. Ryan could not perform CPR, which was required for all nurses. Tr. 42–43. He struggled with a lack of manual dexterity. Tr. 43. Ryan testified that he had "[m]ostly constant pain in both his left and right wrists and hands throughout the day." Tr. 43. On a scale of one to ten, Ryan rated his pain averaged "about a four … [p]robably with medication" and "up to five to six at times" without medication. Tr. 43–44. Ryan usually wore a brace on his right arm and "a lot of times" on his left as well. Tr. 51. The braces stabilized his wrists and prevented them from moving laterally, which caused him pain. *Id*. The braces also limited Ryan's lateral mobility, and thus his ability to turn knobs or grasp items with his hands. *Id*. After Ryan used his hands for 10 to 15 minutes, he need to take a break for 30 minutes. Tr. 49.

Ryan took Advil for the pain and used Voltaren cream. Tr. 52. The Advil made him tired. Tr. 49. After taking Advil for "a long time[,]" Ryan transitioned to using medical marijuana. Tr. 52. The marijuana helped but made him groggy. Tr. 52–53.

After Ryan, vocational expert Mark Anderson testified. Tr. 54–64. According to Anderson, a hypothetical individual with the same age, education, and work experience as Ryan with the limitations assessed in Ryan's RFC, described below, would not be able to perform Ryan's past relevant work. Tr.

56. Such an individual could, however, perform skilled and unskilled labor with a light or sedentary exertional level. Tr. 56–57. Needing to perform a job primarily with one extremity was not work preclusive, and there were jobs available even at a sedentary level with that restriction. Tr. 59–60. Being off task 20% of the workday or absent more than twice a month would preclude such an individual from all work. Tr. 62.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2020.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of November 26, 2015 through his date last insured of December 31, 2020 (20 CFR 404.1571 et seq.).

3. Through the date last insured, the claimant's only severe impairments were internal derangement impairments involving his right wrist (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the left-hand dominant claimant could occasionally operate right hand controls; frequently operate left hand controls; frequently reach overhead with the right;

17

frequently reach in all other directions with the right; occasionally handle with the right; frequently handle with the left; occasionally finger with the right; frequently finger with the left; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was 45 years old on the November 26, 2015 alleged onset date, and he was 50 years old on the December 31, 2020, date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569a and 404.1568(d)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from November 26, 2015, the alleged onset date, through December 31, 2020, the date last insured (20 CFR 404.1520(g)).

Tr. 18–25.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability.

42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage

in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each

element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id*.

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'"

the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

## Discussion

*Whether the ALJ properly applied Social Security Ruling (SSR) 16-3p when evaluating Ryan's subjective reports of pain.*

The ALJ found that Ryan's only severe impairment was internal derangement limitations involving the right wrist. Tr. 18. The ALJ wrote that Ryan's wrist problems significantly limited his ability to perform basic work activities between November 26, 2015, his alleged onset date, and December 31, 2020, the date Ryan was last insured. Tr. 18–19. "More specifically," the ALJ wrote, Ryan was "restricted to a reduced range of light work during this period because of his right wrist problems." Tr. 19. The ALJ found, however, that Ryan's wrist impairments—alone and in combination with his other impairments—did not preclude Ryan from all work. Tr. 21–22. In the RFC, the ALJ determined Ryan had retained the functional capacity to perform light work with postural, manipulative, and environmental limitations. Tr. 18, 21. The ALJ determined that the intensity and persistence of Ryan's symptoms— including wrist pain—did not limit Ryan's ability to perform work-related activities. Tr. 22.

Ryan claims that the ALJ formed the RFC without properly considering the pain caused by Ryan's right wrist internal derangement. Doc. 7, at 12. Ryan alleges that the ALJ failed to comply with the requirements of Social

21

Security Ruling 16-3p, which provides a framework to "evaluate the intensity and persistence of an individual's symptoms such as pain." *Id*. at 12–13; *see* SSR 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims Social Security Ruling 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims, 82 Fed. Reg. 49,462 (Oct. 25, 2017). Ryan alleges that the ALJ justified his reasoning by "cherry-pick[ing] the record and ignore[ing] a large bulk of the record discussing … Ryan's pain … in an effort to undermine [Ryan]'s credibility." Doc. 7, at 14.

SSR 16-3p provides "a two-step process for evaluating an individual's symptoms." 82 Fed. Reg. at 49,463. At step one, the ALJ should "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id*. At step two, the ALJ is to "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim." *Id.* at 49,464.

Here, the ALJ found that Ryan satisfied step one. The ALJ found that Ryan had medically determinable impairments that could reasonably be expected to cause the alleged symptoms. Tr. 22. As Ryan asserts, the issue is thus about step two. Under step two, an ALJ should consider the objective

medical evidence and other evidence, including an individual's statements, medical sources, and non-medical sources. 82 Fed. Reg. at 49,464–65. And when "evaluat[ing] the intensity, persistence, and limiting effects of an individual's symptoms," the ALJ should consider the factors in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). *Id.* at 49,465. These factors are:

> 1. Daily activities;
>
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at 49,465–66.

There is no question that the ALJ was aware of the requirements of SSR 16-3p; he explicitly recited the two-step analysis. Tr. 21. Throughout his analysis of the evidence, in considering Ryan's wrist injury impairment and throughout the rest of his decision, the ALJ discussed the factors in SSR 16-

3p, albeit without specifically referencing each factor. *See* Tr. 18–19, 21–23. The ALJ found that Ryan's statements concerning the intensity, persistence and limiting effects of his symptoms, including his pain, were not entirely consistent with the medical evidence and other evidence in the record. Tr. 21–23.

According to Ryan, the ALJ found Ryan's pain inconsistent because Ryan had no other severe impairments and because of "out of context" surveillance footage that was used against Ryan in his workers' compensation claim. Doc. 7, at 14 (citing Tr. 22). Ryan claims that the inconsistencies on which the ALJ relied did not qualify for consideration under SSR 16-3p and that the ALJ failed to establish a link between the evidence cited and the resulting RFC. *See* Doc. 7, at 14. Ryan is mistaken.

The ALJ used the recitation of the facts on the video as a source that showed Ryan's capabilities, even for a finite amount of time. Tr. 22 (citing Tr. 370). And the video was but one source cited by the ALJ in his consideration of Ryan's abilities and limitations as he developed the RFC. In accord with SSR 16-3p, the ALJ considered Ryan's daily activities. 20 C.F.R. § 404.1529(c)(3)(i). The ALJ cited Ryan's function report when he noted that Ryan had no problems squatting, bending, standing, walking, sitting, kneeling, talking, hearing, climbing stairs, seeing, remembering things, concentrating, understanding things, following instructions, and interacting with others. Tr. 22 (citing Tr. 217). When the ALJ wrote that Ryan was "described at different

24

times [during the relevant period] as enjoying good physical health outside of problems with his right wrist," the ALJ quoted Dr. Erickson's description of Ryan's activities on the May 12, 2016 video. *See* Tr. 22. The ALJ noted that Dr. Erickson saw Ryan "repetitively grasping and lifting what appeared to be landscaping bricks working in his yard" without evidence of "any functional impairment or pain behavior while carrying bricks and other landscaping materials." Tr. 22 (citing Tr. 370). The ALJ noted that Dr. Erickson saw Ryan "utiliz[e] a rake," which implicated his right wrist "again without evidence of any pain behavior or functional impairment." *Id*. In so doing, the ALJ considered the location, duration, frequency, and intensity of Ryan's wrist impairment symptoms, including his pain, and the "factors that precipitate[d] and aggravate[d]" it. 20 C.F.R. § 404.1529(c)(3)(ii), (iii).The ALJ also cited Dr. Hochman's assessment that Ryan had no problems standing, sitting, or walking, and did not have any postural or environmental limitations. Tr. 22 (citing Tr. 749–54).

The ALJ discussed the "type, dosage, effectiveness, and side effects" of Ryan's medications. 20 C.F.R. § 404.1529(c)(3)(iv). The ALJ cited Ryan's medical records during the relevant period and found that they "do not document any ongoing, adverse medication side effects." Tr. 22. The ALJ contemplated "measures other than treatment [that Ryan] used … to relieve his pain and other symptoms," 20 C.F.R. § 404.1529(c)(3)(vi), noting that there was "no evidence [Ryan] had to wear splints [or] braces over any continuous

12-month period" during the relevant time period. Tr. 22. As the ALJ noted that Ryan's primary physician, Todd Hochman, M.D., described Ryan "as someone who did not need splints or braces." Tr. 22 (citing 749–54.)

In addition, the ALJ considered the fact that Ryan "did not attempt to perform any work, including less demanding work, after sustaining the injury in 2015 which rendered him unable to continue as a nurse. Tr. 23; *see* 20 C.F.R. § 404.1529(c)(3) ("[SSA] will carefully consider any other information [a claimant] may submit about [his or her] symptoms, including information about [a claimant's] prior work record").

Ryan quotes the ALJ's statement that there was "scant evidence" of any other impairments aside from Ryan's right wrist and argues that "the ALJ used the lack of additional impairments to minimize Mr. Ryan's existing right wrist pain." Doc. 7, at 14 (citing Tr. 22). Ryan claims that the ALJ minimized the crucial phrase "outside of the problems with his right wrist" and downplayed those problems with his right wrist. *Id.* The rest of the ALJ's decision, however, shows that Ryan misinterprets the point of this passage. The ALJ devoted a significant portion of his discussion to explaining why the focus of his RFC and impairment evaluation was related to Ryan's right wrist impairments and not the other less severe impairments in the record. *See* Tr. 19. For example, the ALJ noted that the "string tying this case together" was Ryan's right wrist complaint and not some of the other impairments such as depression, anxiety, stress, or diabetes. Tr. 19 (citing Tr. 203 and "hearing

testimony"). The ALJ's scant evidence comment helped to explain why the ALJ was focused on Ryan's wrist impairments and pain, not minimizing them. *See* Tr. 19. The complete passage goes on to discuss how and why the ALJ considered Ryan's diabetes, hyperlipidemia, sleep apnea, and mild obesity in the development of the RFC. Tr. 19 (citing Tr. 66–72, 74–80, 217). In the passage, the ALJ explained his consideration of Ryan's wrist impairments as the paramount impairment, not his minimization of them.

Ryan also argues that "the ALJ's logic does not cite to case law [or], regulation." Doc. 7, at 15. But the ALJ cited the pertinent regulations and rules. *See*, *e.g.*, Tr. 17, 18, 21, 23, 24. And Ryan cites nothing to support the idea that an SSA ALJ should cite caselaw in support of his or her decision. Indeed, it is a rare occurrence to see caselaw cited in an SSA ALJ's decision.

Ryan makes a cherry-picking argument and claims that "a non-cherry picked review of the record supports Plaintiff's repeated statements of pain."[17] *See* Doc. 7, at 15–16. The Sixth Circuit, however, has observed that what one might argue is "cherry-picking," might "be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). That Court has further noted that cherry-picking arguments are

---

[17]     Ryan accuses the ALJ of using boilerplate. Doc. 7, at 14. But the only support he cites for his assertion is the ALJ's non-boilerplate statement he wasn't "persuaded that the claimant's impairments caused an additional or greater work-related limitations between November 26, 2015[,] and December 31, 2020." *Id.* (quoting Tr. 22). And Ryan ignores the ALJ's explanation—in the first sentence of the following paragraph—provided "in support of the above point." Tr. 22.

"seldom successful" because "crediting [them] would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014) (internal citation omitted).

Here, the ALJ did not "cherry pick" the record. The ALJ's recitation of the record evidence shows that he credited Ryan's wrist impairments as significantly limiting his functioning. Tr. 18–19. Moreover, the ALJ agreed that due to his wrist impairments, Ryan could not perform his past relevant work as a general duty nurse. And while this evidence is the same evidence on which the state agency physician opinions were based, the ALJ indicated he had "given [Ryan] the benefit of the doubt by finding he has only been able to occasionally use his right upper extremity for certain activities." *See* Tr. 23 (citing Tr. 66–72, 74–80). The ALJ's evaluation of the evidence thus addressed the state agency psychologist's opinions  consistency and supportability. *Cf. Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010) ("the administrative law judge's findings challenge the supportability and consistency of Dr. Moore's diagnoses with the other evidence in the record").

The ALJ followed the requirements of SSR 16-3p[18] in his analysis and cited substantial evidence in the record to support his conclusions "so [that]

---

[18]    Even if the ALJ failed to consider all the Ruling 16-3p factors, Ryan's argument would still fail because "an ALJ is not required to analyze all seven factors." *Pettigrew v. Berryhill*, No. 1:17-cv-01118, 2018 WL 3104229, at *16 (N.D. Ohio June 4, 2018), *report and recommendation adopted*, 2018 WL 3093696 (N.D. Ohio June 22, 2018). Rather, it is sufficient that an ALJ "consider[s] the relevant evidence," *id.*, which the ALJ did.

the individual and any subsequent reviewer [could] assess how the [ALJ] evaluated [Ryan's] symptoms." SSR 16-3p, 2017 WL 5180304, at *10. The ALJ's narrative details specific reasons for his findings as to Ryan's wrist impairments. In contrast, Ryan fails to articulate how the ALJ's conclusions are not supported by substantial evidence. His cherry-picked-evidence argument thus implies that the Court should reweigh the evidence and rule in his favor. But it is not the Court's role to reweigh the evidence. *See Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196 (6th Cir. 2020).

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: October 10, 2023

/s/ *James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)